UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
SABBY VOLATILITY WARRANT MASTER FUND
LTD.,

              Plaintiff,            **OPINION AND ORDER**

       - against -           24 Civ. 920 (NRB)

SAFETY SHOT, INC.

              Defendant.
--------------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Sabby Volatility Warrant Master Fund Ltd. ("Sabby") brought this action on February 8, 2024 against defendant Safety Shot, Inc. ("Safety Shot") for breach of contract.[1]  ECF No. 1. Safety Shot is a publicly-traded company that, at the time of the events underlying this lawsuit, specialized in health-focused beverages.[2]  Sabby is an investment fund that made a series of investments in Safety Shot.

It is undisputed that Safety Shot breached three contracts with Sabby.  First, Safety Shot breached an option or "warrant"

---

[1]    Plaintiff originally brought claims for specific performance, as well as claims for breach of contract.  However, Sabby no longer seeks specific performance.  See ECF No. 86 ("Plaintiff's Proposed Findings of Fact and Conclusions of Law" or "P's PFFCL") at 25 ("The Court should find Safety Shot liable for each of the first three causes of action" for breach of contract and award damages, rather than requiring specific performance).

[2]    Safety Shot has since changed its name to "Bonk, Inc." to reflect a strategic pivot into the cryptocurrency sector.  P's PFFCL ¶ 1.

contract (the "2023 Warrants" or "2023 Warrant Agreements"), which gave Sabby the option to purchase Safety Shot shares at a fixed price, by failing to deliver 306,728 shares (the "Remaining Warrant Shares") when Sabby exercised the 2023 Warrants on November 8, 2023.  ECF No. 16 ("Second Amended Complaint" or "SAC") ¶¶ 20, 52-55 (Count III).  Second, Safety Shot breached a warrant exercise agreement (the "Warrant Exercise Agreement" or "WEA") by failing to deliver an additional 200,000 shares (the "Inducement Shares") offered by Safety Shot to Sabby in exchange for Sabby accelerating its exercise of the remaining 2023 Warrants to November 8, 2023. Id. ¶¶ 19, 45-51 (Count II).  Third, Safety Shot breached a registration rights agreement ("RRA") by failing to register the 306,728 Remaining Warrant Shares with the SEC.  Id.  ¶¶ 20, 39-44 (Count I).

On January 27, 2026, the Court conducted a one-day bench trial solely on the issue of the correct measure of damages for each of Safety Shot's three breaches.[3]  This opinion constitutes the Court's findings of fact and conclusions of law.  See Fed. R. Civ. P. 52(a).

---

[3]    Safety Shot conceded at the outset of trial that it is liable for all three breaches.  ECF No. 95 ("Trial Tr.") at 2:20-3:5.

## Background

### I.   The Parties

Sabby is an investment fund formed under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.  P's PFFCL ¶ 1.  "Sabby routinely invests in publicly traded companies that are seeking capital to develop their businesses, including through PIPE ('Private Investments in Public Equity') deals, which often include warrant agreements," such as the agreements at issue here.  ECF No. 78-1 ("Declaration of Hal Mintz" or "Mintz Decl.") ¶ 3.  Safety Shot is a Delaware corporation with its principal place of business in Jupiter, Florida.  P's PFFCL ¶ 1; see also ECF No. 83 ("Defendant's Proposed Findings of Fact and Conclusions of Law" or "D's PFFCL") ¶ 4.  The first transaction between the parties, which is not at issue here, was a $1.5 million investment by Sabby in Safety Shot warrants and shares (the "2021 Offering").  Mintz Decl. ¶ 4.

### II.   The 2023 Warrants and RRA

Following the 2021 Offering, Safety Shot approached Sabby to participate in a second offering.  Mintz Decl. ¶ 5.  On January 23, 2023, the parties reached an agreement for Sabby to invest $2 million in Safety Shot.  Id.  That agreement was documented by three contracts executed by the parties on January 19, 2023.  First, the parties signed a PIPE Securities Purchase Agreement.

Id.; PX 1.   Second, the parties signed the 2023 Warrant Agreements.[4]  Finally, the parties signed the Registration Rights Agreement.  PX 4; Mintz Decl. ¶ 5(d).

The 2023 Warrant Agreements entitled Sabby to purchase Safety Shot common stock at an exercise or "strike" price of $0.932 per share on the date of exercise.[5]  Mintz Decl. ¶¶ 6-8.  The 2023 Warrants -- like any similar option -- were valuable because they allowed Sabby to profit from price increases.  For example, if the market value of Safety Shot shares rose to $2.00, Sabby could buy shares from Safety Shot for only $0.932 and then re-sell those shares in the market, generating a potential profit of $1.068 per share, minus the initial purchase price of the warrant.

The RRA required Sabby to register the warrants and underlying shares with the SEC, which Sabby did for the 2023 Warrants on July 3, 2023.  P's PFFCL ¶ 8.  Registration was important to Sabby because registration made the securities "unrestricted" under SEC rules, thus allowing Sabby to freely sell the shares in the open

---

[4]   The 2023 Warrants consisted of two tranches of "A-1" warrants and "A-2" warrants for 4,210,526 total shares of Safety Shot stock.  See Plaintiff's Exhibit ("PX") 2 ("A-1 Warrants"), PX 3 ("A-2 Warrants").  The difference between the two tranches was how long the warrants would remain valid such that they could be exercised for shares (three years for the A-1 Warrants versus five years for the A-2 Warrants).  Mintz Decl. ¶¶ 5-6.

[5]   The exercise price was initially $1.00 per share but was revised to $0.932 per share following the "SRM Dividend."  See Discussion Section III.

4

market.  P's PFFCL ¶ 25.  Registration was also important to Safety Shot because, if registered, Sabby could only exercise the warrants for cash (a "cash exercise"), as opposed to cashlessly. P's PFFCL ¶ 12; see 2023 Warrants § 2(c) (warrant holder could only exercise cashlessly "[i]f at the time of exercise hereof, there is no effective registration statement").  In a cash exercise, the warrant holder (here, Sabby) pays the exercise price for each share (here, $0.932) in cash.  By contrast, in a cashless exercise, the warrant holder uses the "in the money" value of the share, meaning the difference between the current market price and the $0.932 exercise price, to pay for the share.  A cashless exercise will result in the warrant holder receiving fewer shares, reduced in proportion to the difference between the market price and exercise price.  Mintz Decl. ¶ 33.  Safety Shot preferred cash exercises because those resulted in an additional infusion of capital.  Id. ¶ 10.

## III.  SRM Dividend and Changes to the 2023 Warrants

On August 14, 2023, after the 2023 Warrants had been issued and registered, Safety Shot announced a spin-off of one of its subsidiaries, SRM Entertainment Inc.  Mintz Decl. ¶ 7.  In connection with this spin-off, Safety Shot issued a dividend of 2,000,000 shares of its common stock (the "SRM Dividend").  Id.

As relevant to this case, the 2023 Warrants contained an anti-dilution provision, which compensated for the new shares issued in the SRM Dividend by decreasing the exercise price of the 2023 Warrants from $1.00 to $0.932 per share. Id. ¶ 8. The dilution caused by the SRM Dividend also meant that the "total number of [Sabby's] warrants increased from 4,210,526 to 4,517,254," for a net increase of 306,728. Id. ¶ 9; see also P's PFFCL ¶¶ 9-11. Put simply, as a result of the SRM Dividend, the 2023 Warrants were automatically modified such that Sabby was entitled to an additional 306,728 shares if and when it exercised the warrants. The issuance of additional shares and corresponding warrants also triggered Safety Shot's continuing obligation to register these new securities within ten days. RRA § 2(d) (requiring all "registrable securities" to be "continuously" registered and setting an "Event Date" for breach if any registrable security remains unregistered for ten consecutive days).

## IV.   The Warrant Exercise Agreement

Beginning in August 2023, the market price of Safety Shot shares rose above the exercise price of $0.932. Mintz Decl. ¶ 10. As a result, Sabby began exercising some of the 2023 Warrants. Id. On November 7, 2023, Safety Shot's CEO, Brian John ("John"), approached Sabby's Chief Investment Officer, Hal Mintz ("Mintz"),

6

with a proposal.  Mintz Decl. ¶ 11.  If Sabby agreed to accelerate its cash exercises by exercising all the remaining 2023 Warrants immediately, Safety Shot would give Sabby additional "inducement" shares as compensation.  Id.

On November 8, 2023, the parties signed the Warrant Exercise Agreement.  PX 8; Mintz Decl. ¶ 12.  Pursuant to the Warrant Exercise Agreement, Sabby would exercise its 2,640,727 remaining 2023 Warrants immediately for cash.  Id.  In exchange, Safety Shot would provide Sabby with 200,000 Inducement Shares free of charge. Id.  Unlike the Remaining Warrant Shares, which should have been registered as of November 8, 2023 pursuant to the RRA, the Inducement Shares "were to be issued as restricted securities, which meant they could not be immediately sold in the public markets."  Mintz Decl. ¶ 13.  The Warrant Exercise Agreement included a provision requiring Safety Shot to "file a registration statement registering the Inducement Shares within 15 days" of November 8, 2023, "and [to] use best efforts to cause such registration statement to be declared [effective]" by the SEC "as soon as possible thereafter."  WEA ¶ 5 (alterations in original); see also D's PFFCL ¶ 23.  The Warrant Exercise Agreement also required that the Inducement Shares be delivered "[u]pon [Safety Shot's] receipt of the proceeds of the Warrant exercise," i.e., as

7

soon as Sabby paid the cash exercise price for the remaining 2023 Warrants.  WEA ¶ 4.

**V.   The November 8, 2023 Exercise**

At 12:15 P.M. on November 8, 2023, Sabby emailed a warrant exercise notice to Safety Shot, and at 4:39 P.M. that same day, Sabby wired $2,461,180.56 as payment for the shares.  See PX 9, PX 10; D's PFFCL ¶ 25; Mintz Decl. ¶ 14.  "At this point, Sabby had performed all of its obligations under the Warrant Exercise Agreement," Mintz Decl. ¶ 14, and was entitled (1) to all the shares subject to the 2023 Warrants and (2) the 200,000 Inducement Shares.  See 2023 Warrants; WEA ¶ 4.

Upon Sabby's payment of the exercise price, Safety Shot delivered 2,333,999 shares to Sabby.  P's PFFCL ¶ 18.  However, it is undisputed that Safety Shot also committed three breaches:

1.   Safety Shot breached the 2023 Warrants by failing to deliver the 306,728 Remaining Warrant Shares.  Id. (citing Mintz Decl. ¶¶ 16, 20).  Safety Shot was obligated to deliver these shares by November 9, 2023, or "one trading day" after exercise of the 2023 Warrants. See 2023 Warrants § 2(d); D's PFFCL ¶ 63; SAC ¶¶ 52-55 (Count III).

2.   Safety Shot breached the Warrant Exercise Agreement by failing to deliver the 200,000 Inducement Shares to Sabby, which were due "upon receipt" of the exercise price on November 8, 2023.  WEA § 4; see also P's PFFCL ¶ 20; SAC ¶¶ 45-51 (Count II).

3.   Safety Shot breached the RRA by failing to register the 306,728 Remaining Warrant Shares and associated warrants

8

by August 24, 2023.[6]  RRA § 2(d); D's PFFCL ¶ 27; P's PFFCL ¶ 54; SAC ¶¶ 39-44 (Count I).

## VI.   Safety Shot's Registration Attempts

On Monday November 13, 2023, Safety Shot informed Sabby that it had failed to deliver the Remaining Warrant Shares because they were not yet registered and "wired back $285,870.50, which represented the price that Sabby had paid to exercise the 306,728 [Remaining] Warrant Shares."  D's PFFCL ¶ 28 (citing PX 11, DX 37).  Safety Shot also failed to deliver the 200,000 Inducement Shares, which -- unlike the Remaining Warrant Shares -- were not supposed to be registered at the time they were delivered.[7]  Mintz Decl. ¶ 16.  The situation was described by Sabby's Chief Operating Officer and General Counsel, Robert Grundstein ("Grundstein"), in a November 13, 2023 internal email: "[Safety Shot] screwed up and hadn't registered enough shares to deliver the full amount [of warrant shares] we were entitled to – they were 306,728 shares short . . . . As the company is going to simply register these ASAP (along with the 200,000 inducement shares they issued to us),

---

[6]   Pursuant to the RRA, the Remaining Warrant Shares should have been registered by August 24, 2023, ten days after the SRM Dividend was issued. See Discussion Section III.

[7]   As Mintz explained in this declaration, "[w]e have never received any explanation from Safety Shot for its refusal" to deliver the Inducement Shares. Mintz Decl. ¶ 16.  In context, Safety Shot's refusal most likely represented a desire to maintain Sabby's incentive to exercise the 2023 Warrants for cash. If Safety Shot withheld the 200,000 Inducement Shares, it would have greater leverage to ensure the 306,728 Remaining Warrant Shares were redeemed by Sabby for cash, as opposed to cashlessly.

we are not reversing the exercise. . . we will send the monies again when they are in a position to deliver the shares." DX 39.

On November 13, 2023, John, Safety Shot's CEO assured Mintz that Safety Shot would register the 200,000 Inducement Shares as soon as possible. D's PFFCL ¶ 31 (citing DX 40 at 1). On November 15, 2024, John informed Mintz via email that Safety Shot would also register the Remaining Warrant Shares "by the end of the week." D's PFFCL ¶ 31 (quoting PX 13). Then on November 16, 2023, John emailed Mintz that "'Q and S3 are being filed as we speak,' referring to a Form 10Q and Registration Statement on Form S-3." P's PFFCL ¶ 14 (quoting PX 14). Mintz replied, "[I] [s]ee the 10q and s3A. [L]et us know when staff clear the amendment and we'll cash ex the public warrants," PX 14, meaning "Mintz had seen both filings on the SEC website, and was ready to exercise the remaining warrants for cash when possible." P's PFFCL ¶ 14 (citing Mintz Decl. ¶ 20).

Thereafter, Safety Shot made a number of filings with the SEC. On November 16, 2023, Safety Shot filed a Form S-3 registration statement for warrant shares issued in the separate 2021 Offering but did not include the 2023 Warrants or Inducement Shares in that filing. P's PFFCL ¶ 22 (citing Mintz Decl. ¶ 17). On November 22, 2023, Safety Shot filed another Form S-3, which

10

included both the Remaining Warrant Shares and the Inducement Shares.  PX 15; see also D's PFFCL ¶ 33; P's PFFCL ¶ 22.  However, on December 6, 2023, before the SEC had approved it, Safety Shot withdrew that S-3.  PX 17; D's PFFCL ¶ 34.  Safety Shot states that it intended to "file a new registration statement on Form S-1" instead of Form S-3, D's PFFCL ¶ 34 (quoting PX 17), because "the Form S-1 is the most comprehensive of the various types of registration statements [and is] required of issuers that are not eligible to use any of the abbreviated registration forms," id. ¶ 35 (quoting Boyce v. Soundview Tech. Grp., Inc., 464 F.3d 376, 380 n.3 (2d Cir. 2006)).  Sabby does not accept this explanation.  P's PFFCL ¶ 22 ("This filing was required by Section 5 of the Warrant Exercise Agreement" and "withdrawal was contrary to Safety Shot's obligation under the Warrant Exercise Agreement to use 'best efforts to cause [the] registration statement to be declared [effective] as soon as possible thereafter.'") (citation omitted).

## VII.  Cashless Exercises

On January 31, 2024, "Sabby informed Safety Shot that it could not wait any longer [for Safety Shot] to register the shares and submitted a cashless exercise notice for the [Remaining] Warrant Shares."  Mintz Decl. ¶ 26; see also D's PFFCL ¶ 38.  John asked Sabby for more time, representing that the shares would be

11

registered soon.  PX 18 at -795 ("Give us one more day.").  Sabby agreed to hold off on its cashless exercise.  Mintz Decl. ¶ 26. However, Safety Shot failed to register the shares within "one day."  PX 18 at -795.  As a result, "[o]n [Thursday] February 2, 2024, Sabby sent a cashless exercise [notice] for the 306,728 [Remaining] Warrant Shares," which, when accounting for the "in the money" value of the warrants, would "entitle[] [Sabby] to receive 212,692 shares" by Monday, February 6.  Mintz Decl. ¶ 33; see also D's PFFCL ¶ 39.

 Safety Shot did not honor the cashless exercise by February 6.  Mintz Decl. ¶ 43.  On February 16, 2024, after filing this lawsuit on February 8, ECF No. 1, Sabby again tried to cashlessly exercise the warrants.  Mintz Decl. ¶ 45.  However, Safety Shot again refused to allow a cashless exercise.  Id. ¶ 46.  John replied that "these warrants are registered now" by the S-3 approved by the SEC on February 13, 2026, and demanded a cash exercise.  PX 21 at -082.  Mintz responded that he was referring to the 2023 Warrants, and that only unrelated warrants from the 2021 Offering had been successfully registered on February 13. Id. at -081.  Rather than addressing Sabby's response, John told Mintz that "the board is determined, they are not doing cashless exercises looks like this matter will be settled in court."  Id.

Mintz replied, "That's fine.  [Safety Shot and/or its board] are going to spend and lose multiples of the $300k a cash exercise would yield the company."  Id.

## VIII.   Sabby's Short Positions

After Safety Shot failed to deliver the Remaining Warrant Shares on November 8, 2023, Sabby made an additional bet in the market, without informing Safety Shot.  On November 14, 2023, Sabby sold "short" 306,728 shares, i.e., the same number as the Remaining Warrant Shares, to "lock in the current price and avoid a loss."  Mintz Decl. ¶ 21; see also id. (table showing a series of "short" trades on November 14, 2023, which collectively amount to 306,728 shares).  By making an equal and opposite bet, Sabby hoped to mitigate the risk that the market price of the Remaining Warrant Shares would decline before the shares were delivered.

Sabby kept its short position open for almost four months from November 14, 2023 to March 8, 2024 (the "Short Period"). Mintz Decl. ¶ 29.  To keep the position open, Sabby had to make daily "short interest" payments in cash to the true owners of the shorted shares, which amounted to a total of $1,060,729.62 over the course of the "Short Period."[8]  Id. ¶ 29.  According to Sabby, it was forced to keep the position open, rather than close it

---

[8]    Sabby also incurred a small additional loss of $31,953.05 when it closed or "covered" the position on March 8, 2024.  Mintz Decl. ¶¶ 31-32.

13

earlier, because Safety Shot shares rose from $2.14 on November 16, 2023 to a high of $7.50 on November 21, 2023, and stayed high for the rest of the Short Period.  ECF No. 91 ("P's Post-Trial Br.") at 11-12 ("[O]nce the stock rose, it was economically rational to maintain the short position rather than close it out.  For example, had Sabby purchased shares to close its 306,728 shorts at the high price of $7.50, it would have been forced to pay $2,300,460 to cover shares it had sold for approximately $656,397.92—a loss of $1,644,063, much more than the [$1,092,682 in] consequential damages Sabby is currently seeking.").  However, as the Court will discuss, Sabby's own exhibits show that the price of the shares stayed closer to $2.14 than to $7.50 for much of the Short Period, and even dipped below $2.14 at several points.  See Discussion Section IV; PX 28 (chart showing the price of Safety Shot shares for each day during the Short Period).

### Procedural History

Sabby filed its complaint on February 8, 2024.  ECF No. 1.  It subsequently filed a first amended complaint on March 8, 2024, ECF No. 12, then, after a conference with the Court, filed a second amended complaint on May 1, 2024, see SAC.  Safety Shot answered on June 7, 2024, and amended its answer on June 27, 2024.  ECF Nos. 22, 25.  On September 6, 2024, with the Court's permission,

14

Sabby brought a motion to strike two of Safety Shot's affirmative defenses (the "Dealer Defenses").  ECF No. 33.  After receiving briefing from the parties, the Court granted Sabby's motion to strike the Dealer Defenses on March 17, 2025.  ECF No. 63.  On April 16, 2025, the parties concluded discovery, except for certain disputed items.  ECF No. 64.  The Court resolved the discovery disputes on June 16, 2025.  ECF No. 70.

On September 2, 2025, the parties requested that the Court set a date for a bench trial.[9]  ECF No. 72.  The Court set January 27, 2026, as the start date for trial, and set a schedule for pre-trial submissions.  ECF No. 75.  In advance of trial, the parties submitted direct testimony by affidavit.  Sabby submitted the direct testimony of Mintz and Grundstein.[10]  Mintz Decl.; ECF Nos.

---

[9]    As explained by plaintiff's counsel, one or both of the parties could have brought a summary judgment motion.  Trial Tr. at 4:21-5:2.  However, to avoid duplicative efforts, and given that the issues has been narrowed by the time of trial to damages alone, the parties elected to proceed directly to a bench trial.  Id. at 5:2-21.

[10]    The parties withdrew all objections to one another's exhibits, except defendant's objection to PX 29, the Expert Witness Report of Grundstein.  See ECF No. 87.  Safety Shot objected to Grundstein's report on the grounds that he is an interested party (as COO and GC of Safety Shot) and thus could not submit expert testimony.  Id.  Both before and at trial the Court stated its position that despite Grundstein's status as an interested party, the Court could evaluate any bias or credibility issues without formally excluding his testimony.  See Trial Tr. at 137:10-23 ("THE COURT: I think a Court can understand what company he's affiliated with. And how that affiliation might impact his views, so I stick to my earlier ruling."); ECF No. 65.  This is consistent with the approach taken by other courts in similar situations.  Rekor Sys., Inc. v. Loughlin, No. 19 Civ. 7767 (LJL), 2023 WL 1777248, at *3 (S.D.N.Y. Feb. 6, 2023) ("where a bench trial is in prospect, resolving Daubert" or similar "questions at a pretrial stage is generally less efficient than simply hearing the evidence") (quoting Victoria's Secret Stores Brand Mgmt., Inc. v.

78-2 ("Grundstein Decl."), 88 ("Mintz Supp. Decl."). Safety Shot submitted the direct testimony of its damages expert, Gontran de Quillacq, see ECF No. 80 ("de Quillacq Decl."), but put forward no fact witnesses. Both parties filed proposed findings of fact and conclusions of law. See P's PFFCL; D's PFFCL. The parties also exchanged exhibit lists in advance of trial, which were preadmitted into evidence by the Court. See ECF Nos. 78-3 ("P's Exhibit List"), 79 ("D's Exhibit List"). Certain additional exhibits used for cross-examination were introduced during trial and also received into evidence. See Trial Tr. at 6:22-7:7.

At trial, Safety Shot cross-examined Mintz but elected not to cross-examine Grundstein. Trial Tr. at 137:4-5. Sabby cross-examined Mr. de Quillacq. Trial Tr. at 139:20-156:21. The trial ended after only one day, and the Court set a schedule for post-trial briefing. Trial Tr. at 164:11-22. On February 13, 2026, both parties submitted an opening brief, P's Post-Trial Br., 92 ("D's Post-Trial Br."), and on February 27, 2026, both parties filed responsive briefs, ECF Nos. 93 ("P's Post-Trial Response"), 94 ("D's Post-Trial Response").

---

Sexy Hair Concepts, LLC, 2009 WL 959775, at *6 n.3 (S.D.N.Y. Apr. 8, 2009)); see also Matter of Manhattan by Sail, Inc., 436 F. Supp. 3d 803, 810 (S.D.N.Y. 2020) ("there is no need for the Court to gate keep testimony from itself") (citation and internal quotation marks omitted).

## Discussion

As noted earlier, Safety Shot has conceded liability on all three claims for breach of (i) the 2023 Warrant Agreements (2023 Warrants) (Count III), (ii) the Warrant Exercise Agreement (Count II), and (iii) the Registration Rights Agreement (Count I).  We will discuss the appropriate measure of damages for each of these three breaches.

## I.   Breach of the 2023 Warrant Agreements (Count III)

First, the Court will assess the amount of damages due to Sabby for Safety Shot's failure to deliver the 306,728 Remaining Warrant Shares in breach of the 2023 Warrant Agreements.

### a. Liquidated Damages

Sabby claims $6,116,837.09 in liquidated damages arising from Safety Shot's failure to deliver the Remaining Warrant Shares pursuant to a liquidated damages clause in Section 2(d) of the 2023 Warrant Agreements.  P's Post-Trial Br. at 15.  That liquidated damages clause reads as follows:

> If the Company fails for any reason to deliver to the Holder the Warrant Shares subject to a Notice of Exercise by the Warrant Share Delivery Date, the Company shall pay to the Holder, in cash, as liquidated damages and not as a penalty, for each $1,000 of Warrant Shares subject to such exercise (based on the V[olume ]W[eighted ]A[verage ]P[rice] of the Common Stock on the date of the applicable Notice of Exercise), $10 per Trading Day (increasing to $20 per Trading Day on the third

17

> (3rd) Trading Day after the Warrant Share Delivery
> Date) for each Trading Day after such Warrant Share
> Delivery Date until such Warrant Shares are
> delivered or Holder rescinds such exercise.

2023 Warrants § 2(d)(i).  "This formula equates to 1% or 2% of the value of undelivered shares, per diem."[11]  Mintz. Decl. ¶ 37.

Safety Shot argues that that Section 2(d) is an unenforceable "penalty" and that there exists a reasonable measure of "actual" damages, namely, "the difference between [the] option price and the stock's fair market value at the time of the breach," multiplied by the number of undelivered shares.  Davidowitz v. Patridge, No. 08 Civ. 6962 (NRB), 2010 WL 5186803, at *11 (S.D.N.Y. Dec. 7, 2010) (citations omitted); see also D's Post-Trial Br. at 8-9, 12-16.  In response, Sabby advances two arguments: (i) that Safety Shot is collaterally estopped from arguing Section 2(d) is an unenforceable "penalty" given a January 2025 New York state court decision in Bigger Capital LLC v. Safety Shot, Inc., No. 650148/2024 (N.Y. Sup. Ct. 2025) ("Bigger Capital"), and (ii) that even if Safety Shot is not collaterally estopped, the provision is not a penalty.  P's Post-Trial Br. at 4-9.  We address these arguments seriatim.

### i. Collateral Estoppel

---

[11]    Put differently, the provision charges 1% of the value of the shares per day for the first three days, then 2% per day thereafter.  Mintz Decl. ¶ 37.

The collateral estoppel issue must be evaluated in the following context. "When a district court sits in diversity, the governing preclusion law is that of the state in which the court is located—in this case, New York." EMA Fin., LLC v. Chancis, 80 F.4th 395, 404 (2d Cir. 2023). "The requirements for collateral estoppel under New York law are [1] that the issue be identical and necessarily decided in the prior proceeding, and [2] that the party against whom preclusion is sought was accorded a full and fair opportunity to contest the issue in the prior proceeding." Long Island Lighting Co. v. Imo Indus. Inc., 6 F.3d 876, 885 (2d Cir. 1993); see also Kaufman v. Eli Lilly & Co., 65 N.Y.2d 449, 455 (1985).

The posture of Bigger Capital is also significant. That case was brought by a different warrant holder, Bigger Capital, against Safety Shot for failure to deliver shares upon the exercise of warrants. P's Post-Trial Br. at 7-8. Although New York courts allow the use of "nonmutual offensive" collateral estoppel, "that is, the assertion by a plaintiff that a defendant has litigated and lost a defense in a lawsuit to which the plaintiff was not a party," application of the doctrine "rests within the 'broad discretion' of the trial court." Cent. Mut. Ins. Co. v. Rogowski, No. 07 Civ. 8366 (SCR) (LMS), 2009 WL 10739923, at *13 (S.D.N.Y.

19

Mar. 23, 2009) (citing Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 331-32 (1979)).  This is because generally "[t]he offensive use of collateral estoppel does not promote judicial economy in the same manner as defensive use does."[12]  Parklane Hosiery Co., 439 U.S. at 329.

Applying New York's test, we must first assess whether the issue litigated in Bigger Capital is "identical" to the issue here. Without question, the issue in Bigger Capital bears some similarities to this case: both actions involved (i) a liquidated damages clause (ii) setting liquidated damages at 2% per day (iii) if Safety Shot failed to deliver shares upon exercise of a set of warrants.  See ECF No. 85-6 (redline of 2021 warrants at issue in Bigger Capital (the "2021 Warrants") against the 2023 Warrants) ("Warrant Redline") § 2(d).  However, the Court does not conclude that the issues were "identical" for three reasons.  First, the 2021 Warrants are a distinct contract from the 2023 Warrants at issue here.  Second, there are several textual differences between Article 2(d) in the 2021 Warrants and Article 2(d) in the 2023 Warrants.  For example, the 2021 Warrants escalate the liquidated damages on the fifth day of breach, whereas the 2023 Warrants raise the daily liquidated damages amount on the third day of breach.

---

[12]    The Court also notes that collateral estoppel is a doctrine that restricts a party to the prior lawsuit, not the Court.

20

See Warrant Redline § 2(d).   Third, the contracts in general contained different provisions, such as a different strike price ($0.932 in the 2023 Warrants versus $1.40 in the 2021 Warrants). D's Post-Trial Br. at 13.

Even where there are similarities between contracts, courts have held that "collateral estoppel does not apply to similarly worded yet separate contractual documents."  See Cent. Mut. Ins. Co., 2009 WL 10739923, at *13 (citing Moore's Federal Practice - Civil § 132.02[2][a] (2009)).  Where collateral estoppel is used offensively by a plaintiff who was not a party to the prior lawsuit, this is especially the case.  Id.  Here, the Court holds that because the 2021 Warrants were issued at a different time, at a different price, to different buyers, and with different contractual language than the 2023 Warrants at issue in this case, offensive collateral estoppel does not apply because the issues are not "identical."[13]

In sum, the Court is not precluded by the collateral estoppel doctrine from considering whether Section 2(d) of the 2023 Warrants

---

[13]    "It is well settled that a fully litigated and opposed summary judgment determination can constitute a full and fair opportunity to litigate a claim." In re Arfa, No. 14 Civ. 7895 (AJN), 2015 WL 5610864, at *8 (S.D.N.Y. Sep. 23, 2015) (quoting Deutsch v. Integrated Barter Int'l, Inc., 700 F. Supp. 194, 200 (S.D.N.Y. 1988)).  While we have found that the issues are not identical in the context of offensive collateral estoppel, we do not dispute that Safety Shot had a full and fair opportunity to litigate in Bigger Capital.

is enforceable.  However, the Court may still consider the state court's decision in Bigger Capital to the extent it is persuasive.

### ii. Merits

Next, we must determine whether the liquidated damages provision of the 2023 Warrants is enforceable.  See 2023 Warrants § 2(d).  Liquidated damages clauses are generally enforceable unless the party opposing enforcement can demonstrate "that the stipulated damages are, in fact, an unconscionable penalty."  L & L Wings, Inc. v. Marco-Destin Inc., 756 F. Supp. 2d 359, 363 (S.D.N.Y. 2010).  The party opposing enforcement, in this case Safety Shot, can meet this burden by demonstrating "either that (1) the damages that would result from a breach were capable of estimation at the time at which the contract was forged, or (2) showing that the prescribed damages stand in evident disproportion to this anticipable injury."  AXA Inv. Managers UK Ltd. v. Endeavor Cap. Mgmt. LLC, 890 F. Supp. 2d 373, 388 (S.D.N.Y. 2012) (citing L & L Wings, Inc., 756 F. Supp. 2d at 363).

Safety Shot argues that damages were "capable of estimation" at the time the 2023 Warrants were signed because there exists a standard measure of damages for failure to deliver stock pursuant to a warrant.  D's Post-Trial Br. at 15-16.  "Under New York law, 'it is appropriate to assess damages for breach of contract based

22

on a failure to issue a warrant or a failure to honor a warrant by comparing the warrant's strike price to the market price of the stock on the date of attempted exercise.'" Iroquois Master Fund, Ltd. v. Quantum Fuel Sys. Techs. Worldwide, Inc., No. 13 Civ. 3860 (CM) (SN), 2014 WL 2800752, at *1 (S.D.N.Y. June 17, 2014), aff'd, 641 F. App'x 24 (2d Cir. 2016) (quoting Maxim Grp. LLC v. Life Partners Holdings, Inc., 690 F. Supp. 2d 293, 301 (S.D.N.Y. 2010)). "For publicly-traded stock," like Safety Shot, "the market price of the stock on the date of the breach is calculated as the mean between the highest and lowest quoted selling prices, as provided by the public exchange upon which the stock traded." Id. (citation and internal quotation marks omitted).

Sabby disagrees, arguing that "[the] liquidated damages clause compensates Sabby for foregone investment opportunities, which are necessarily hard to quantify." P's Post-Trial Br. at 5 (citing AXA Inv. Managers UK Ltd., 890 F. Supp. 2d at 389). Sabby points out that because Safety Shot shares were highly variable, the failure to deliver shares promptly could result in lost profits well exceeding the default damages amount if, for example, the price surged a few days after the date of exercise, but before the shares were delivered pursuant to that exercise. Id. at 5-6.

Justice Crane in Bigger Capital acknowledged the default

23

rule, i.e., that damages for failure to deliver stock equal the difference between the exercise price and market price, but concluded that the default rule was not dispositive given other case law upholding similar liquidated damages provisions. ECF No. 85-5 ("Bigger Capital Opinion") at 22:17-22 ("Defendant made a really good argument that the price of publicly traded stock is so readily ascertainable that liquidated damages are not appropriate. But that would mean that liquidated damages are never appropriate, and we know that that's not how the case law works."). In particular, Justice Crane cited to SuperCom, Ltd. v. Sabby Volatility Warrant Master Fund Ltd., 700 F. Supp. 3d 146, 162 (S.D.N.Y. 2023) ("Supercom") and Laurus Master Fund, Ltd. v. Versacom Int'l, Inc., No. 02 Civ. 5340 (LTS)(MHD), 2003 WL 21219791, at *5 (S.D.N.Y. May 21, 2003) ("Laurus"). Bigger Capital Opinion at 23:3-9. Justice Crane concluded that the formulation in Supercom and Laurus of the liquidated damages amount as a "percent[age] of the outstanding principal" implied a direct "relationship to plaintiff's actual or expected damages."[14] Id.

---

[14] In full, Justice Crane explained her reasoning as follows:

> If you compare [Laurus and Supercom] to a case like LG Cap Funding, LLC versus M Line Holdings, Inc., which is 422 F. Supp. 3d 739 at 748 (Eastern District of New York 2018), the liquidated damages was a penalty. But in that case, defendant was required to pay $250 per day after four days and increasing to $500 per day beginning on the 10th day. And the court found that on its face, this clause did not have any

24

at 23:9-18.  By contrast, other opinions overturning liquidated damages involved clauses where liquidated damages were a "random" and fixed amount, e.g., "$250" per day.  Id.

This Court respectfully disagrees with Justice Crane.  First, the Court concludes that Supercom and Laurus are distinguishable. In SuperCom, Sabby brought a counterclaim to enforce the liquidated damages provision of a registration rights agreement, which is more akin to the RRA liquidated damages provision at issue infra, Discussion Section III.  That provision, unlike the one at issue here, prescribed 2% damages per month, rather than per day. SuperCom, 700 F. Supp. 3d at 163.  As a result, the Supercom court's finding that "liquidated damages not disproportionate" is not analogous.  Here, Sabby calculates liquidated damages under Section 2(d) of the 2023 Warrant as $6,116,837.09 as of the January 27, 2026 date of trial, and continuing to accrue until the "date of judgment."  P's Post-Trial Br. at 15.  By contrast, under the default rule, the Court calculates compensatory damages to be $221,641.65, plus 9% annual interest.  See infra Discussion Section I.b.

---

relationship to plaintiff's actual or expected damages. The money was just a random amount.

Bigger Capital Opinion at 23:10-18.

25

The Court also finds that Judge Swain's opinion in Laurus is distinguishable because it is not clear that the parties in Laurus ever contested the enforceability of the liquidated damages clauses. Judge Swain recites the various liquidated damages provisions without discussing whether they could be a penalty or citing caselaw regarding the enforceability of liquidated damages clauses. Laurus Master Fund, Ltd., 2003 WL 21219791, at *5. The Laurus opinion even uses the word "penalty" to describe the relevant liquidated damages provision, an odd choice of words if the opinion were intended to hold the opposite. Id.

In Justice Crane's view, whether a liquidated damages clause constitutes a penalty may be discerned by whether the liquidated damages amount is expressed as a percentage or as a fixed dollar amount. However, this Court concludes that either structure can be a penalty if the provision operates as a ratchet designed to compel specific performance by steadily increasing the costs for a refusal to perform. Agerbrink v. Model Serv. LLC, 196 F. Supp. 3d 412, 417 (S.D.N.Y. 2016) ("[T]he essence of a penalty" is that it is "designed 'not to make a fair estimate of damages to be suffered but to serve only as an added spur to performance[.]'") (quoting Priebe & Sons v. United States, 332 U.S. 407, 413 (1947)). That is the case here. While the liquidated damages clause states

26

that it is "not a penalty," Section 2(d)(i) provides that damages will continue to accrue indefinitely, "<u>until such Warrant Shares are delivered</u>[.]"  2023 Warrants § 2(d)(i).  Put differently, the only way for Safety Shot to prevent the liquidated damages from continuing to accrue is to perform by delivering the shares.  Thus, the liquidated damages provision here is similar to the language we found to be unenforceable in <u>Adar Bays, LLC v. 5Barz Int'l, Inc.</u>, No. 16 Civ. 6231 (NRB), 2018 WL 3962831, at *14 (S.D.N.Y. Aug. 16, 2018) (stating that a liquidated damages provision is a penalty if damages "are now accruing <u>until the shares are delivered</u>").

Sabby observes that "[h]ad the shares been delivered to Sabby in January 2025 after the <u>Bigger Capital</u> ruling, Sabby's liquidated damages would have been halved to approximately $3 million."  P's Post-Trial Response at 5.  Put differently, Safety Shot's decision to defend against Sabby's damages claim would be the true cause of over half of the liquidated damages claimed.  This proves Safety Shot's point, not Sabby's: the primary determinant of damages is the length of time Safety Shot refuses to render specific performance, which is not a reasonable estimate of actual damages.  <u>Agerbrink</u>, 196 F. Supp. 3d at 417.

Finally, the liquidated damages sought are "grossly

27

disproportionate" to actual damages for failure to deliver the Remaining Warrant Shares. Rubin v. Napoli Bern Ripka Shkolnik, LLP, 179 A.D.3d 495, 496 (1st Dep't 2020) (quoting Truck Rent-A-Ctr. v. Puritan Farms 2nd, 41 N.Y.2d 420, 423-424 (1977)) ("If . . . the amount fixed is plainly or grossly disproportionate to the probable loss, the [liquidated damages] provision calls for a penalty and will not be enforced."). As of January 27, 2026, Sabby calculates the liquidated damages amount as $6,111,837.09 "plus $12,369.74 per trading day thereafter." ECF No. 84 ("P's Pre-Trial Br.") at 26. This stands in stark contrast to the Court's calculation of damages under the default rule of only $221,641.65, plus 9% annual interest.[15] See infra Discussion Section I.b. That disparity reflects the structural problems with Section 2(d) of the 2023 Warrants, which imposes daily penalties for nonperformance instead of providing a reasonable estimate of actual damages.

For the aforementioned reasons, the Court finds that the liquidated damages provision of the 2023 Warrants is an unenforceable penalty.

---

[15]   Sabby's calculation of approximately $600,000 in compensatory damages is also incorrect because it sets the breach date as February 6, 2024, rather than November 9, 2023, when Safety Shot failed to deliver the Remaining Warrant Shares. See infra Discussion Section I.b. (calculating expectation damages as $221,641.65, plus 9% interest per annum).

28

**b. Compensatory "Expectation" Damages**

Having concluded that liquidated damages are not recoverable, the Court will apply the default rule: damages must equal the difference between the mean market price on the date of breach and the exercise "strike" price of the 2023 Warrants ($0.932). Iroquois Master Fund, Ltd., 2014 WL 2800752, at *1.

While neither party disagrees on the parameters of the default rule, they do disagree on the "date of breach." Safety Shot argues that it breached the warrant exercise agreement as of November 9, 2023, by failing to deliver the shares pursuant to the November 8, 2023 exercise. D's PFFCL ¶¶ 62-63 (the "proper breach date" is "November 9, 2023 . . . because the Warrants required Safety Shot to deliver the Remaining Warrant Shares no later than 'one trading day' after Sabby delivered the cash to exercise the Remaining Warrants."). By contrast, Sabby submits that the proper "date of breach" is February 6, 2024, when Safety Shot failed to deliver the Remaining Warrant Shares pursuant to Sabby's February 2, 2024 cashless exercise. P's PFFCL ¶ 37.

To justify the February "breach date," Sabby argues that "[b]oth Sabby and Safety Shot . . . treated the November 8 [cash] exercise as withdrawn or rescinded[.]" P's PFFCL ¶ 25. Sabby claims that it chose to exercise cashlessly on February 2 after

29

deciding that Safety Shot would not be able to deliver registered shares.  See supra Discussion Section VII.  However, the Court rejects Sabby's position that there was a rescission of the November 8, 2023 cash exercise, such that it could then re-exercise and use that new date as the "date of breach."  Even though Safety Shot returned the exercise price to Sabby, the Court does not interpret this as an "acknowledg[ment] that the exercise was rescinded" by the parties.  P's Post-Trial Response at 2.  Indeed, this is not how Mr. Grundstein understood it.  See PX 11 at -659 (stating "we are not reversing the exercise" and "the company is wiring back to us the exercise proceeds" which "we will send . . . again when they are in a position to deliver the shares") (emphasis added).

There are several other indicators that Sabby did not view the November 8, 2023 exercise as rescinded.  First, Sabby internally accounted for the returned funds as an "account payable" to Safety Shot.[16]  Second, Sabby opened a short position equal to

---

[16]    At trial Mr. Mintz testified as follows during cross-examination:

> Q. And Mr. Grundstein writes, "how would you like to
> account for this cash? My suggestion is to set up an
> account payable in that amount"; correct?
> A. Yes.
> Q. And when you set up an account payable that means
> that Sabby still owes Safety Shot that money; right?
> A. That's correct.
> Q. At least that's how the books are going to reflect
> it?

306,728 shares, in an effort to "lock in" the profit from the November 8, 2023 exercise.  Mintz Decl. ¶ 21.  The record supports that Sabby (i) viewed the November 8, 2023 exercise as still effective and (ii) expected to receive the shares pursuant to the November 8, 2023 exercise.[17]  Thus, the Court rejects February 6, 2024 as the date of breach.

Safety Shot itself seems to be confused about what date in November 2023 should be the "date of breach."  In Safety Shot's Proposed Findings of Fact and Conclusions of Law, Safety Shot urged the Court to find Thursday, November 9, 2023 as the "date of breach" because that was "one trading day" after Sabby paid the exercise price.  D's PFFCL ¶¶ 62-63 (citing 2023 Warrants § 2(d)).  However, in his expert report, Safety Shot's expert, Gontran de Quillacq, used the market price on Wednesday, November 8, 2023.  de Quillacq Decl. ¶ 74 (using $1.7025 VWAP).  Also in Safety Shot's

---

A. That's correct.

Trial Tr. at 39:15-23.

[17]    To hold otherwise could create perverse incentives.  Rather than sue for breach promptly or unambiguously reaffirm the cash exercise and wait for delivery, a warrant holder would have a new, additional option.  Either (1) the warrant holder could wait for delivery of the shares pursuant to the first exercise or (2) "re-exercise" the same, previously-exercised warrants cashlessly on a different date if the market price of the shares rose.  Assuming, as is the case here, that the counterparty was unwilling to forego a cash exercise they believed was still operative, the warrant holder would be able to "pick" the date of breach and disproportionately inflate their compensatory damages.

31

post-trial briefing, Safety Shot urges the Court to find that November 10, 2023 is the date of breach.  See D's Post-Trial Response at 1 n.1 ("assuming" a "breach date of November 10, 2023" for failure to deliver the Remaining Warrant Shares).

Safety Shot's confusion about its own "date of breach" theory does not inspire confidence.  However, regardless of Safety Shot's presentation of alternative dates, the Court concludes that the correct "date of breach" is evident from the contract itself. Section 2(d) required Safety Shot to "cause the Warrant Shares purchased hereunder to be transmitted" to Sabby "by the **earliest** of (i) two (2) Trading Days after delivery to the Company of the Notice of Exercise, (ii) one (1) Trading Day after delivery of the aggregate Exercise Price to [Safety Shot] and (iii) the number of Trading Days comprising the Standard Settlement Period after the delivery to the Company of the Notice of Exercise (such date, the "Warrant Share Delivery Date").  2023 Warrants § 2(d).  A "Trading Day" "means a day on which the Common Stock is traded on a Trading Market," which would include Wednesday, November 8, Thursday, November 9, and Friday November 10, 2023.  Id. § 1 ("Definitions"). The "Exercise Price" means $1.00 "subject to adjustment" down to $0.932 for the SRM Dividend.  Id. § 2(b).  The "Standard Settlement Period" means the "standard settlement period,

32

expressed in a number of Trading Days, on the Company's primary Trading Market with respect to the Common Stock as in effect on the date of delivery of the Notice of Exercise." Id. § 2(d); see "Understanding Settlement Cycles," FINRA https://www.finra.org/investors/insights/understanding-settlement-cycles (last accessed June 19, 2026) (The standard settlement period on the Nasdaq is "T+1" meaning "next business day after a trade.").

The Court concludes that November 9, 2023 is the proper date of breach. Sabby both made the "Notice of Exercise" and delivered the "Exercise Price" on the same day, November 8, 2023. 2023 Warrants § 2(d); P's PFFCL ¶¶ 16-17. Therefore, the "earliest" date would be November 9, 2023, under either prong (ii) (one trading day after payment of exercise price) or (iii) (T+1 Standard Settlement Period) of Section 2(d)'s "Warrant Share Delivery Date" definition. Id. Prong (i) of the definition is clearly not the "earliest" because it is "two (2) Trading Days" after the Notice of Exercise, which would be November 10, 2023.[18] Id.

Safety Shot has not provided a clear estimate of damages using

---

[18] Section 2(d) seems to prescribe a different, same-day timeline if any "Notice(s) of Exercise [are] delivered on or prior to 12:00 p.m. (New York City time)." 2023 Warrants § 2(d). This is clearly inapplicable because the Notice of Exercise was delivered at 12:15 p.m. See PX 9; D's PFFCL ¶ 25; P's PFFCL ¶ 16.

November 9, 2023 as the date of breach.  However, the correct amount is easily discernable under the default rule.  The Court calculates the damages for breach of the 2023 Warrants as the difference between the VWAP[19] of Safety Shot shares on November 9, 2023 ($1.6546) and the exercise price ($0.932), multiplied by the number of Remaining Warrant Shares (306,728), for a total of $221,641.65, plus interest at the statutory rate of 9% per annum. Iroquois Master Fund, Ltd., 2014 WL 2800752, at *1; see also N.Y. C.P.L.R. § 5004.

## II.   Breach of the Warrant Exercise Agreement (Count II)

Next, the Court must determine the correct measure of damages for Safety Shot's failure to deliver or register the 200,000 Inducement Shares, in breach of the Warrant Exercise Agreement. The Inducement Shares were offered by Safety Shot to Sabby in the Warrant Exercise Agreement as an incentive for Sabby to exercise all the remaining 2023 Warrants on November 8, 2023.  The shares were offered at no additional cost.  See Mintz Decl. ¶¶ 14-16. Because the Inducement Shares came at no extra charge, the correct measure of damages is the market value on the "date of breach," multiplied by the number of shares.  Iroquois Master Fund, Ltd.,

---

[19]    Volume Weighted Average Price (VWAP) is the accepted measure of the average daily price used by both parties, as calculated by Bloomberg L.P.  The VWAP of Safety Shot shares on November 9, 2023 was $1.6546.  PX 28 at 6; see also 2023 Warrants § 1.

2014 WL 2800752, at *1.

The Inducement Shares present a slightly different issue than the Remaining Warrant Shares because, unlike the Remaining Warrant Shares, the Inducement Shares were not supposed to be registered on the same day they were supposed to be delivered. See supra Background Section IV. Thus, there are two potential breach dates. Safety Shot argues the Warrant Exercise Agreement was breached on November 8, 2023, the date the shares should have been delivered. D's Post-Trial Br. at 9-11; see also WEA § 4 (Safety Shot was required to deliver the Inducement Shares "[u]pon . . . receipt" of the exercise price, which was transmitted and received on November 8, 2023); P's PFFCL ¶ 20; AC ¶¶ 45-51. Sabby submits that the proper breach date is February 13, 2024, the date the shares could have become fully registered if Safety Shot had used "best efforts." See P's Post-Trial Br. at 12-13; see also WEA § 5.

Sabby's argument that damages should be measured as of February 13, 2024, the earliest date by which Safety Shot could have registered the shares pursuant to the November 16, 2023 S-3, must be rejected. P's Post-Trial Br. at 12-13. Regardless of Sabby's hypothetical registration timeline, the Second Circuit has explicitly refused to extend the "date of breach" to some

hypothetical registration date if the relevant shares were not delivered in the first place. Cottam v. 6D Glob. Techs., Inc., No. 21-1031 Civ., 2022 WL 16908708, at *2 (2d Cir. Nov. 14, 2022) ("Cottam also contends that the district court should have measured damages from the date the stock became unrestricted, not the date of the breach. But under New York law, breach of contract damages are to be measured from the date of the breach," which was the date "when [plaintiff] did not receive the number of shares to which he was entitled[.]") (citation and internal quotation marks omitted).

Mr. de Quillacq has calculated damages "at the time of the exercise on November 8, 2024 [as] $340,500.00" by taking the VWAP on November 8, 2023 ($1.7025) multiplied by the number of Inducement Shares (200,000). de Quillacq Decl. ¶¶ 73, 79; D's PFFCL ¶ 53; see also PX 28 at 6. Sabby, while rejecting November 8, 2023 as the breach date, has not challenged de Quillacq's calculation.[20] See P's PFFCL ¶ 80.

---

[20]    The Court recognizes that the value of restricted stock is often discounted. However, Safety Shot has not sought any such discount. Moreover, Sabby's "expectation damages" argument has merit: even though the securities were not initially supposed to be registered, they should have and would have been freely tradeable at some point after November 8, 2025. See Scully v. US WATS, Inc., 238 F.3d 497, 514 (3d Cir. 2001) ("Although the District Court's damage calculation disregards the restricted period applicable to Scully's shares by omitting the discount, we think the Court's approach was warranted" because "intrinsic value, which does not account for an option's reduced risk of loss and increased likelihood of profit, generally understates an option's true value."). Thus, no discount for the restricted status of the Inducement

Consequently, the Court awards damages of $340,500.00,[21] plus pre-judgment interest at the statutory rate of 9% per annum from November 8, 2023.  N.Y. C.P.L.R. § 5004.

## III.   Breach of the Registration Rights Agreement (Count I)

Next, the Court must determine what damages are owed for Safety Shot's breach of the Registration Rights Agreement pursuant to the RRA's liquidated damages provision.  See RRA § 2(d).

The RRA required Safety Shot to maintain an "effective Registration Statement," which was to "remain continuously effective as to all Registrable Securities included in such Registration Statement."  Grundstein Decl. ¶ 21 (quoting RRA § 2(d)(v)).  It is undisputed that both the 2023 Warrants and the underlying 306,728 Remaining Warrant Shares were "Registrable Securities" pursuant to the RRA.[22]  Id. ¶ 22.  Accordingly,

_____

Shares will be applied.

[21]    For no apparent reason, Safety Shot's Post-Trial Briefing lists the proper calculation as "no more than $328,000" rather than "$340,500," the amount listed in their pre-trial submissions.  Compare D's Post-Trial Br. at 9 with de Quillacq Decl. ¶ 79; D's PFFCL ¶ 53.  The post-trial estimate is clearly in error because it says "SHOT's median price on November 8, 2023 was $1.64"  D's Post-Trial Br. at 9 (citing PX 28).  But PX 28 clearly shows that VWAP was 1.7025 on November 8, 2023, the same number used in de Quillacq's pre-trial calculation.  PX 28 at 5.

[22]    De Quillacq does not dispute that the Remaining Warrant Shares are "registrable securities," and instead devotes a substantial amount of time to arguing whether the Inducement Shares would be "registrable" under the RRA.  See de Quillacq Decl. ¶ 148.  De Quillacq fights a straw man, as Sabby has not asserted that the Inducement Shares are covered by the RRA.  See generally Grundstein Decl.

37

"[t]here are two separate sources of damages under the RRA: first, damages arising from Safety Shot's failure to register the 2023 Warrants that were created as a result of the SRM Dividend, and second, damages arising from Safety Shot's failure to register the shares underlying those warrants, namely, the [Remaining] Warrant Shares."  Id. ¶ 24.

The RRA included a liquidated damages provision, which Sabby seeks to enforce.  P's Post-Trial Brief at 14.  The provision awards liquidated damages starting on an "Event Date," which occurs when "after the effective date of a Registration Statement, such Registration Statement ceases for any reason to remain continuously effective as to all Registrable Securities included in such Registration Statement, or the Holders are otherwise not permitted to utilize the Prospectus therein to resell such Registrable Securities, for more than ten (10) consecutive calendar days[.]"  RRA § 2(d).  Liquidated damages after the "Event Date" amount to 2% per month of the "Subscription Amount," i.e., the cash value of the warrants and shares, plus 15% interest per annum if liquidated damages were not paid within seven days. See RRA § 2(d); Grundstein Decl. ¶¶ 26, 28.

Safety Shot opposes the enforcement of the RRA's liquidated damages clause on two grounds.  First, it argues that there are

38

no "actual damages" because Sabby suffered no additional harm from the failure to register the Remaining Warrant Shares.[23]  D's Post-Trial Br. at 16.  Second, Safety Shot argues that the clause in unenforceable because it permits "double recovery" for both Safety Shot's failure to deliver the Remaining Warrant Shares on November 8, 2023 and its failure to register those same shares.  Id. at 16-17.  The Court will address each of Safety Shot's arguments in turn.

Safety Shot argues that there are no actual damages because the 2023 Warrants allowed Sabby to cashlessly exercise if the securities were unregistered.  D's Post-Trial Br. at 16.  Thus, Sabby could expect to receive shares regardless of their registration status.  However, even if Sabby had successfully received unregistered shares through a cashless exercise, it still would have had to wait "six months" to obtain freely tradeable shares.[24]  Id.  During that time, the value of the shares could

---

[23]    Safety Shot also argues that it (Safety Shot) was the party harmed, because its failure to register meant that it didn't receive cash from the attempted cash exercise by Sabby in November 2023.  D's Post-Trial Br. at 16. While Safety Shot was undoubtedly also injured by its own failure to register and deliver the Remaining Warrant Shares, that is irrelevant to the question of whether and by how much Sabby was injured by the same action.

[24]    The hypothetical ability of Sabby to cashlessly exercise the warrants if the securities remained unregistered is a red herring, since in February Safety Shot also rejected Sabby's effort to cashlessly exercise in February 2024. Id.; see supra Background Section VII.

39

hypothetically rise, then fall, without Sabby having the opportunity to freely sell the shares on the market and reap a profit.[25]  Safety Shot is correct that such damages are somewhat speculative.  But that is precisely the purpose of liquidated damages clauses, including the one Safety Shot agreed to in the RRA: they attempt to estimate damages in contexts where "the amount of actual loss is incapable or difficult of precise estimation." BOCA Aviation Ltd. v. AirBridgeCargo Airlines, LLC, 669 F. Supp. 3d 204, 234 (S.D.N.Y. 2023).

Safety Shot's "double recovery" argument is also misplaced. As Sabby has explained, registration itself has value because it allows the owner of the stock to immediately trade the shares on the open market.  Grundstein Decl. ¶ 20.  While there are ways to sell unregistered stock, such shares are typically sold at a markdown because they are illiquid.  See Friedman v. Beway Realty Corp., 87 N.Y.2d 161, 166 (1995).  In this context, the Court agrees with Sabby that "[l]iquidated damages . . . bear a

---

[25]    As explained by Mr. Mintz during his cross examination:

> [I]f Safety Shot went from one to seven during the first six months after the transaction, we couldn't rely on Rule 144 to exercise the warrants. So investors, in general, require companies to move swiftly or along some agreed time path to register the securities so they don't lose out on that possible opportunity cost of having a stock soar and not be able to monetize the investment.

Trial Tr. at 18:7-14.

reasonable proportion to the probable loss[.]" BOCA Aviation Ltd., 669 F. Supp. 3d at 234.

The Court also notes that upholding the RRA's liquidated damages clause does not contradict the Court's earlier holding that the 2023 Warrants' liquidated damages clause is an unenforceable penalty. See supra Discussion Section I. Unlike the liquidated damages provision in the 2023 Warrants, the liquidated damages provided for by the RRA are 2% per month rather than 2% per day. Compare 2023 Warrants § 2(d) with RRA § 2(d). This results in $229,666.11 in liquidated damages arising from Section 2(d) of the RRA, in contrast to $6,116,837.09 in claimed liquidated damages arising from Section 2(d) of the 2023 Warrants. P's Post-Trial Br. at 15. Thus, the concerns raised by the Court as to the 2023 Warrant's liquidated damages clause -- that the proposed liquidated damages were an "unenforceable penalty" and "grossly disproportionate" -- are essentially vitiated. See supra Discussion Section I.a.ii. The Court's decision here comports with Judge Preska's decision in SuperCom, which upheld a near-identical liquidated damages provision of an RRA agreement for 2% per month of the subscription amount of the unregistered securities, plus 16% interest per annum. 700 F. Supp. 3d at 160-63. Judge Preska held that "the amount of the liquidated damages

is not disproportionate to Sabby's potential for loss as a result of not having registered freely trading shares by [the registration deadline.]"  SuperCom, 700 F. Supp. 3d at 162.  Furthermore, the SuperCom court did not find a problem with double recovery, because the RRA and warrants there, as here, were separate contracts.  Id. at 179 (awarding both "liquidated damages for breach of the RRA and . . . compensatory damages for breach of . . . the Warrant") (emphasis added).

The Court finds that liquidated damages began to run on August 24, 2023, because that was "the tenth day after the issuance of the [Remaining] Warrant Shares."  Grundstein Decl. ¶¶ 23-30; see also RRA § 2(d) (the "Event Date" occurs when "Registration Statement ceases for any reason to remain continuously effective as to all Registrable Securities included in such Registration Statement . . . for more than ten (10) consecutive calendar days").[26][27]  See Grundstein Decl. ¶¶ 26-30.  As stated earlier,

---

[26]    Safety Shot does not raise any dispute as to the calculation of the RRA damages in its post-trial brief.  However, several issues in de Quillacq's submission warrant attention.  First, de Quillacq calculates liquidated damages due for the RRA using the same method as Grundstein, but he places the "Event Date" as November 13, 2023.  de Quillacq Decl. ¶¶ 173-88.  By his own admission, de Quillacq's choice of "Event Date" was "an arbitrary decision, which is not grounded in RRA § 2(d)."  de Quillacq Decl. ¶¶ 178-79.  Thus, the Court will, as Sabby urges, disregard de Quillacq's "arbitrary" choice.

[27]    Safety Shot also failed to calculate or discuss liquidated damages with respect to the 2023 Warrants (as opposed to the Remaining Warrant Shares).  As explained by Grunstein, both the warrant (the option to purchase the shares at a fixed price) and the shares themselves had value and each had to be registered with the SEC.  Grundstein Decl. ¶¶ 20-26.  Thus, each qualified as a

liquidated damages amount to 2% per month of the "Subscription Amount," plus 15% interest per annum.  See RRA § 2(d); Grundstein Decl. ¶¶ 26, 28.  Applying these provisions to the relevant 2023 Warrants ($0.125 x 306,728) and underlying Remaining Warrants Shares ($0.932 x 306,728), Sabby calculates RRA liquidated damages as $229,666.11, plus prejudgment interest of 15% since January 27, 2026.  Grundstein Decl. ¶¶ 29-30 (Although interest has been running since 2023, Sabby's calculation is "inclusive of interest" through January 27, 2026).

In sum, the Court awards liquidated damages pursuant to the RRA of $229,666.11, plus prejudgment interest at a rate of 15% per annum.  RRA § 2(d); PX 27.

## IV.  Consequential Damages

Sabby also seeks "consequential" damages arising from its unilateral decision to sell 306,728 shares of Safety Shot stock "short" on November 14, 2023.  Sabby sold that number of shares short to mitigate the risk that the market price would decline before Safety Shot delivered the 306,728 Remaining Warrant Shares. Mintz Decl. ¶ 21.  The claimed consequential damages arising from this short sale fall into two buckets.  P's Post-Trial Br. at 9-12; see also P's Post-Trial Response at 8-9.  First, Sabby requests

---

"registrable security" pursuant to RRA § 2(d).

43

$31,953.05 in damages incurred when it "covered" or closed its short position on March 8, 2024.  Mintz Decl. ¶ 32.  Second, Sabby seeks to be compensated for approximately $1,060,729.62 in daily "short interest" payments it made to keep the short position "open" from November 14, 2023 to March 8, 2023.  Id.  ¶ 29

Before discussing whether Sabby is entitled to consequential damages, we will briefly describe the dynamics of a "short" sale.  A "short" is a transaction whereby the "short seller," in this case Sabby, "borrows" shares from their original owner(s) and agrees to return those shares at some future date. After borrowing the shares, the "short seller" immediately sells those shares in the market.  If the market price falls, the short seller repurchases the same number of shares at the lower price and returns them to the original owner.  In that case, the short seller makes a profit equal to the difference between the market price on the day it opened the short position and the day it returned the shares.  If, however, the market price of the shares rises rather than falls after the short position is taken out, the short seller will have to repurchase the shares at a higher price to close the position and will therefore suffer a loss.  There is also a third possibility: that the "short seller" takes out a short position but, rather than repurchasing the shares on the open

market, expects to receive the same number of shares through a "warrant" or similar private deal.  In that case, the shares received from the exercise of the warrant could be used to "cover" the short position previously taken by the short seller. Importantly, in all short transactions, the short seller pays a daily fee, called "short interest," to the original owner(s) to continue borrowing the shares, i.e., to "hold open" the short position.

Here, the parties dispute whether consequential damages for (i) the cost to "close" the short position and (ii) the cost to hold open the short position were foreseeable to the parties at the time of contracting.  P's Post-Trial Br. at 11; D's Post Trial Br. at 18-19.  "To obtain consequential damages, . . . the plaintiff must show that (1) the damages sought were 'foreseeable and within the contemplation of both parties,' and (2) both the existence and amount of damages can be ascertained with 'reasonable certainty.'"  NAF Holdings, LLC v. Li & Fung (Trading) Ltd., No. 10 Civ. 5762 (PAE), 2016 WL 3098842, at *15 (S.D.N.Y. June 1, 2016) (quoting Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 111 (2d Cir. 2007)).  "To determine whether consequential damages were reasonably contemplated by the parties, courts must look to the nature, purpose and particular

45

circumstances of the contract known by the parties . . . as well as what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made." Kenford Co., Inc. v. County of Erie, 540 N.Y.S.2d 1, 4 (1989).

### a. Aristocrat Cases

Sabby relies on the "Aristocrat" cases to support its argument that consequential damages were "foreseeable" here. See P's Post-Trial Br. at 11. There were two relevant opinions in that case. The first decision, "Aristocrat I," was issued on a motion for summary judgment. Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas, 618 F. Supp. 2d 280, 303 (S.D.N.Y. 2009). In Aristocrat I, Judge Leisure held that "[defendant Aristocrat] understood that at least some of the [plaintiff] Bondholders . . . would sell short, and a failure to deliver shares upon conversion would leave those Bondholders with an open short position," such that the Bondholders would have to purchase shares on the market to close that short position. Id. However, the Court in Aristocrat I also held that "there are genuine issues of material fact as to the reasonableness of [the] Bondholders' decisions to hold open [rather than close] their short positions after Aristocrat's breach," and reserved that issue for the jury.

46

Aristocrat I at 311 (emphasis added).   In "Aristocrat II," the court upheld the jury's verdict that the "Bondholders' actions in maintaining their short positions did not constitute an unreasonable failure to mitigate consequential damages." Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas, 727 F. Supp. 2d 256, 266 (S.D.N.Y. 2010) (emphasis added).   In sum, Aristocrat I discussed whether consequential damages for closing a short position were foreseeable, whereas Aristocrat II discussed whether consequential damages for holding open a short position were foreseeable.

Given this distinction between the two Aristocrat opinions, we will first address whether Aristocrat I supports Sabby's position that it is entitled to $31,953.05 for the cost of closing its short position.   Then we will discuss whether Aristocrat II supports Sabby's position that it is entitled to $1,060,729.62 for the "short interest" incurred it keep its short position open.

b. **Damages for the Cost of Closing the Short Position**

With respect to the $31,935.05 paid by Sabby to close its short position, the Court finds that Aristocrat I is distinguishable and that consequential damages were not "foreseeable" here.   In Aristocrat I, the plaintiffs were a class of bondholders who, pursuant to an "Indenture," possessed an option

47

to "convert" the bonds into Aristocrat shares, but who after noticing their decision to convert, never received the shares. Aristocrat I at 286-87.  As a result, any bondholder who held an open short position as of the date of breach didn't receive shares from Aristocrat and was thus compelled to purchase those shares on the open market to "cover" the short at a loss.  Id.

While Aristocrat I is similar to this case, there are two important distinctions.  First, here Sabby opened its short position on November 14, 2023, after the failure by Safety Shot to deliver the shares, whereas in Aristocrat I, the plaintiffs already had "open short position[s]" at the time Aristocrat failed to deliver the Shares.  Compare Mintz Decl. ¶ 21 with Aristocrat I at 303-04.  Sabby did not open a 306,728-share short position at the time of contracting, or before the breach.  Rather, it took out its short after the breach to hedge against the possibility the price would decline.  Mintz Decl. ¶ 21.  Second, the plaintiffs in Aristocrat I were a large class of bondholders with varied investment strategies.  Judge Leisure's decision in Aristocrat I repeatedly observed the idea that Aristocrat should have known that "many purchasers," or "certain purchasers," or "some of the Bondholders" would sell short.  Aristocrat I at 303-04.  By contrast, the same "law of averages" inference cannot be

48

made in this case because there was only one relevant warrant holder: Sabby.

Sabby's other evidence that the parties contemplated damages for closing short sales is unconvincing.  Sabby cites the "anti-dilution" provision of Section 6 of the Warrant Exercise Agreement -- which prevented Safety Shot from diluting its shares for 14 days -- as evidence that the parties expected "Sabby [to] sell[] its shares" soon after it exercised the 2023 Warrants.  P's Post-Trial Br. at 10 (citing WEA § 6).  However, Section 6 does not imply that Sabby would sell other shares short then use the shares delivered pursuant to the 2023 Warrants to cover that short position.[28]  Similarly, the Form S-3 filed on November 22, 2023, while acknowledging the possibility "that the 306,728 shares it was registering could be used for the 'settlement of short sales,'" id. (quoting PX 15 at 26), also included a list of nine other "methods" recipients of the shares could use "when selling securities," PX 15 at 26.

Sabby's contention that it would be a "common sense expectation" for it to take out its short is unsupported.  P's Post-Trial Br. at 10.  While the Court accepts Sabby's logic that

---

[28]    While the anti-dilution provision protected Sabby by preventing dilutions such as the SRM Dividend, Sabby has not proven that these dilutions were so common that Sabby could not or would not hold the shares for longer than 14 days.

it could "short an equivalent number of shares to hedge" against the risk that the market value of the 306,728 Remaining Warrant Shares would decline, Sabby does not confront that fact that shorting shares would create new risks that a reasonable party would not necessarily "foresee."  P's Post-Trial Br. at 8.  First, there was the risk that Safety Shot, having already failed to deliver and register the Remaining Warrant Shares would be unable or unwilling to do so in the future, thus leaving Sabby with an open short position without shares to "cover" its losses.  Second, there was the possibility that the shares, even if delivered, would be delivered too late to make the daily cost of "holding open" the short worth it.  Given these risks, a reasonable party could not "foresee" that Sabby would take out a large short position in the aftermath of Safety Shot's breach.

For the preceding reasons, Sabby's request for $31,935.05 in damages for the cost of closing its short position must be denied.

### c. Damages for Costs to Hold Open the Short Position

Next, the Court must consider whether it was "foreseeable" at the time of contracting that Sabby would "hold open" its short position for a four-month period from November 14, 2023 to March 8, 2024.  The Court concludes that Sabby's decision was not foreseeable and that its request to recover $1,060,729.62 in "short

interest" payments must be denied.

First, the Court finds that Aristocrat II is distinguishable because it was decided based on a different legal standard.  In Aristocrat II, Judge Leisure upheld a jury verdict finding that the plaintiff bondholders were not "unreasonable" "to have held their short positions open with the expectation of receiving shares of Aristocrat stock."  Aristocrat II at 266.  The Court in Aristocrat was considering the issue on a Rule 50(b) motion, which obliges the Court to defer to the jury's determination.  Id. at 265; see Fed. R. Civ. P. 50(b).  By contrast, here the Court, not a jury, is the factfinder and there is no need to show deference.  Moreover, in Aristocrat II, the defendant bore the burden of proving its affirmative defense that the Bondholders had not "reasonably mitigated" their damages in holding the short open.  Aristocrat II at 278.  In this case, the burden rests squarely with the plaintiff (Sabby) to prove that its damages were "foreseeable."

Aristocrat II is also distinguishable on the facts.  While the Bondholders in Aristocrat II successfully argued that "they did not close their short positions because they had been promised shares and [thus] it made no sense . . . [to] buy them in the market," Aristocrat II at 266, that logic does not apply here.  It

is apparent that by December 2023, Sabby fully understood that "even if [Safety Shot] filed S1 today [Sabby wouldn't] get shares until 2024."  D's PFFCL ¶ 36 (citing PX 16).  Indeed, even if Safety Shot had followed Sabby's preferred course of action -- including the Remaining Warrant Shares in the November 16, 2023 S-3 -- that registration statement was not approved by the SEC until February 13, 2024.  Mintz Decl. ¶ 17.  Given these facts, Sabby should have known that it would be several months at least before it received tradeable shares.  Thus, Sabby knowingly assumed the risk that the "short interest" payments required to borrow the shares would accumulate and wipe out any profit it expected to preserve through its hedge.  Mintz Decl. ¶ 21.

Lastly, the Court does not accept Sabby's proffered justification for holding open the short position.  Sabby argues that "Safety Shot's stock price swiftly rose to a high of $7.50" on November 21, 2023 and that "had Sabby purchased shares to close its 306,728 shorts at the high price of $7.50, it would have been forced to pay $2,300,460" to buy shares in the open market, thus incurring "a loss of $1,644,063."  P's Post-Trial Br. at 11-12. A close of the "high" and "low" market prices of Safety Shot during the Short Period, PX 28 at 1-2, as well as mean prices, id. at 5-6, shows that Mintz has cherry picked his $7.50 example.  See PX

52

28.   For instance, the very next day, on November 22, 2023, the "Low" Price for Sabby shares was only $2.72.  Id.  Prices remained in the $3 range through December, then dropped consistently into the $2 range by January.  Id.  On January 16, 2024, for example, the "High" price of Safety Shot Shares was $2.20 and the "Low" was $1.70, below the $2.14 price at the time the short position was opened.  Id. at 2.  Nonetheless, Sabby did not avail itself of the clear opportunity to close its position until March 8, 2023, almost two months later.  Even when prices were around $3 or $4, it is not obvious that Sabby would have saved more by keeping the positions open (and paying daily short interest), than it would have by purchasing shares to close the shorts.  See PX 16 (Sabby had already paid $400,000 in short interest by December 22, 2023).  Where, as here, the plaintiff holds the burden to prove both the "existence" and "amount" of consequential damages with "reasonable certainty," this uncertainty is fatal.  NAF Holdings, LLC, 2016 WL 3098842, at *15.

As a result, Sabby's request for consequential damages is denied.

**V.   Prevailing Party**
Finally, the Court must address whether either party is entitled to attorney's fees as the "prevailing party."  See 2023 Warrants § 5(e); see also P's Post-Trial Br. at 15; D's Post-Trial Response

53

at 10-11; Mintz Decl. ¶ 53 (forecasting that Sabby will seek prevailing party fees and costs pursuant to Fed. R. Civ. P. 54(d) and the 2023 Warrants).

To identify the "prevailing party," "[c]ourt[s] must first analyze 'the true scope of the dispute litigated' and then compare 'what each party achieved within that scope.'" TIG Ins. Co. v. Newmont Min. Corp., 413 F. Supp. 2d 273, 282 (S.D.N.Y. 2005), aff'd, 226 F. App'x 49 (2d Cir. 2007) (quoting Botwinick v. Duck Corp., 700 N.Y.S.2d 143, 145 (1st Dep't 1999)). Applying this standard, the Court concludes that neither party is entitled to attorney's fees as a "prevailing" party.

First, it is clear that Safety Shot is not the "prevailing Party" because it has lost on all three of its breach of contract claims. Safety Shot argued that if it prevailed on the liquidated damages issue, which it has, see Discussion Section I, it should be declared the "prevailing party." D's Post-Trial Response at 10-11 (citing Matsumura v. Benihana Nat. Corp., No. 06 Civ. 7609 (NRB), 2014 WL 1553638, at *5 (S.D.N.Y. Apr. 17, 2014)). However, in Matsumura, upon which Safety Shot relies, the defendant secured total dismissal of the "central" "breach of contract" claim. 2014 WL 1553638, at *5. By contrast, Safety Shot has been held liable for all three breach of contract claims brought by Sabby. Although

54

the issue of liability was resolved on the morning of trial by Safety Shot conceding liability, it was nevertheless actively litigated.[29]  This precludes a finding that Safety Shot is the "prevailing party."

Likewise, Sabby cannot be the "prevailing party" either because it has lost on most of the issues litigated at trial. Sabby failed to obtain either liquidated damages or consequential damages, by far the largest issues at trial, and its proposed timelines for calculating the "date of breach" have been rejected by this Court in favor of Safety Shot's.  See supra Discussion Sections I, II, IV.  The only damages dispute Sabby has prevailed on is the RRA liquidated damages claim, which is small in comparison to other damages issues raised at trial.  See supra Discussion Section III.

In sum, "the Court is constrained to conclude that neither party 'predominated'" and that "[g]iven this equipoise, justice demands that both parties pay their own attorneys' fees and costs." In re Navidea Biopharmaceuticals Litig., No. 19 Civ. 1578 (VEC), 2025 WL 1221014, at *7 (S.D.N.Y. Apr. 24, 2025); see also Matter of Milton R., 153 N.Y.S.3d 526, 529 (2021) ("considering the true

---

[29]    The parties submitted "three substantive memoranda of law," "three sets of letters," "clarif[ication] of the discovery disputes," made "oral arguments" regarding whether the affirmative "Dealer" defenses raised by Safety Shot would shield Safety Shot from liability.  See ECF No. 63 at 5-6.

scope of the dispute litigated and what was achieved within that scope, we conclude that neither party [is] entitled to attorney's fees and costs as a prevailing party").

## Conclusion

Having considered all the evidence, the Court finds that Safety Shot is liable on Counts I-III of the Second Amended Complaint and awards damages as follows:

1.    Compensatory damages of $221,641.65, plus prejudgment statutory interest of 9% per annum since November 9, 2023, for Safety Shot's failure to deliver the 306,728 Remaining Warrant Shares in breach of the 2023 Warrants.  AC ¶¶ 52-55 (Count III).

2.    Compensatory damages of $340,500.00, plus prejudgment statutory interest of 9% per annum since November 8, 2023, for Safety Shot's failure to deliver the 200,000 Inducement Shares in breach of the Warrant Exercise Agreement.  AC ¶¶ 45-51 (Count II).

3.    Liquidated damages of $229,666.11, plus prejudgment interest at a rate of 15% per annum since January 27, 2026,[30] for Safety Shot's failure to register the 306,728 Remaining Warrant Shares and 2023 Warrants in breach of the RRA.  AC ¶¶ 39-44 (Count I).

Counsel shall confer and submit a proposed form of judgment

---

[30]    Although interest has been running since 2023, Sabby's calculation is "inclusive of interest" through January 27, 2026.  See Grundstein Decl. ¶ 30.

with damages calculated as provided above no later than August 7, 2026.

Dated:    New York, New York
          July 29, 2026

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE